[No. 30232. Department Two. November 13, 1947.]

WOODROW W. SEWELL, *Appellant*, v. VIRGINIA SEWELL, *Respondent*.[1]

*Griffin & Griffin,* for appellant.

*Don Cary Smith,* for respondent.

ROBINSON, J.—Our rules require an appellant to preface his brief with a concise statement of the question or questions involved. In complying therewith, the appellant states:

"The question involved in this case is whether or not the welfare of the minor child of the parties is still the paramount matter to be considered in the care, custody and control of minor children in this state."

It is but fair to appellant's counsel to note that their brief was printed and filed prior to the annual convention of the Washington state bar association at which that exact question was minutely examined and considered by a large panel of distinguished members of the bar, resulting in their unanimous conclusion that: "The law is clear. In a case of this kind the welfare of the child is paramount." This court has hitherto held, or at least strongly intimated on

[1]Reported in 186 P. (2d) 372.

several occasions, that this is the standard rule. We might, therefore, summarily dispose of this appeal but for the fact that the texts of the briefs in the case make it clear that the real question submitted for our decision is: Did, or did not, the trial court disregard that rule in entering its interlocutory decree in this cause?

We have read and examined the factual record, which consists of a transcript of the oral evidence given by ten witnesses, the written depositions of five others, and five documentary exhibits. We think it unnecessary to make a detailed resume of all the evidence bearing upon the question presented. However, the appellant is entitled to a fair general statement of the principal facts upon which he relies.

The parties to this action were married in August, 1938. At that time, the plaintiff-appellant, Woodrow W. Sewell, was twenty-one years of age, and the respondent, fifteen. Her parents had been divorced for some years, exactly how many the record does not show, but it does show that her father married his present wife in December, 1934, when respondent was eleven years old. Prior to their separation in October, 1944, appellant and respondent lived the greater part of the time with relatives, part of the time with respondent's own mother, part of the time with her father and stepmother, and a much greater portion with the appellant's mother. Between these sojourns they lived, for short periods, in an apartment in Spokane, and, for a short time, in a boxcar. For some months prior to their separation, they lived in a house in Spokane which they purchased on contract.

Appellant, Sewell, testified, in responding to a direct question by the court, that the small boy, who is the subject matter of this controversy and who was called "Pidgie" throughout the trial, was born on December 20, 1940. However, the appellant was very inaccurate concerning a number of things, and we are satisfied, by the testimony of other witnesses, and particularly by that of appellant's mother, that the child was born in December, 1941. He was, therefore, not five years of age, as alleged in the complaint, which

instituted this action, in April, 1946, although he became so before the interlocutory decree appealed from was entered.

It may be stated at this point that no allegations of sexual misconduct were made by either party. Both parties alleged mental and physical cruelty, and the allegations of both were supported by evidence. For example, as to one quarrel, appellant testified as follows:

"Q. How many times did she hit you? A. About five times on each side of the face, I imagine. Q. Did it leave any marks? A. My face looked something like a piece of hamburger."

Respondent admitted that she slapped appellant on that occasion, but not that the act resulted in such colorful consequences. It would seem that appellant, Sewell, was physically able to defend himself. After defendant rested, he was called·on rebuttal. He did not in any respect deny, rebut, or explain the following testimony previously given by Mrs. Sewell:

"A. After the baby was born he came home about 2:00 o'clock in the morning and I asked him to get another blanket and put on the bed. He said, 'Get it yourself.' I said, 'Get me a blanket, please.' 'Get out of bed and get it yourself.' And he pulled me out of bed, and I went to get back in bed without getting the blanket, and he kicked me in the stomach clear across the room and broke a great big bay-window."

Nor did he rebut or contradict the following testimony:

"Q. Did he ever strike you after you moved to Spokane? A. Oh, yes, he hit me on various occasions. Sometimes I deserved it and sometimes I didn't."

This was not the first divorce action between the parties. They separated in September of 1944. Mrs. Sewell shortly thereafter brought suit for divorce in the superior court of Spokane county. Having no funds, she was compelled to work and placed her child with Mrs. Bivins, the wife of a high school teacher. About three weeks thereafter, or at least some time in October, appellant appeared at the Bivins and asked to take the child to see an alleged relative

in the vicinity of Spokane. He took the boy directly to Seattle and refused to return him.

As we understand the record, the Spokane action was tried early in 1945. Instead of at once entering a decree, Judge Foley, of the superior court of Spokane county, who presided at the trial, made many commendable efforts to reconcile the parties. His repeated conferences with them in chambers failed to produce the desired result. The Spokane court finally entered findings of fact and conclusions of law on July 9, 1945. Although there is some conflict in the evidence concerning the matter, we are satisfied, from the record, that, due to the indifference of her then attorney, Mrs. Sewell was not notified that findings and conclusions would be submitted for entry on that date; nor did she learn for some time that they had been entered. The findings and conclusions constitute the only part of the record in the Spokane case which we have before us. They are brought here to show that, in that action, the court entered the following finding:

"Defendant now has his minor son with him at his mother's home in Seattle, Washington, which home is a fit and proper place for the rearing of said child and defendant is a fit and proper person to have the care, custody and control of said minor son until the further order of the court."

The court also entered the following conclusion of law:

·"Defendant is a fit and proper person to have the care, custody and control of Woodrow Ronald Sewell, minor son of the parties hereto, until the further order of the court."

There is no finding that the respondent was not a fit and proper person to have custody and control of the child.

As to the question before us in this case, the above pronouncements of the Spokane court have little or no materiality. According to undenied evidence in the present case, at the time the above finding and conclusion were entered in the Spokane action, the respondent in this action had no way of taking care of the child, other than returning it to Mrs. Bivins or to some other stranger to the blood. When the interlocutory decree here appealed from was

entered, nearly two years later, conditions, as will be later noted, were quite different.

At some time early in 1946, after a conference between appellant's attorneys, respondent's now attorney, and Judge Foley, the Spokane case, which had been instituted by Mrs. Sewell, was dismissed, and Mr. Sewell, on his part, filed this action on April 25, 1946. On allegations that the defendant had frequently threatened to take the child from his custody by stealth, an order was entered citing Mrs. Sewell to show cause why she should not be enjoined from so doing. Her counsel, presumably to avoid the expense of bringing his client and her witnesses from Spokane, consented to the entry of such an order. However, in July, 1946, upon the insistence of his client, he moved for an order granting her temporary custody of the child. This was denied by Judge Batchelor, of the superior court of King county.

Sewell had permitted Mrs. Sewell to have the child for a Christmas visit in 1945. He claimed that she failed to return the boy at the time she had promised to do so, and that he had to go to Spokane to recover him. That this claim is true seems to be tacitly admitted in a letter his wife wrote to him while this action was still pending, a portion of which reads as follows:

"Hello Woodie:                 December 5, 1946
"I hope you will find it in your heart to understand what I am about to ask.
"As you know I want Pidgie for all time, but as long as things are as they are, perhaps you will let me have him at least for Christmas. You will probably consult everyone in your family and they will most likely tell you as they have before, not to let me have him. This time I hope you will listen to what you only know is right.
"*When you let me have Pidgie before nobody got hurt but me, because I had to give him back again.*" (Italics ours.)

Her request was refused.

This cause came on for trial on the following February 26th. At its close, the trial judge indicated, in an oral opinion, that he would hold that both parties were entitled to a divorce and would award the custody of the child to the

defendant mother. Some few days thereafter, she petitioned for the boy's temporary custody. Although the record does not show that this petition was denied by Judge Todd of the superior court of King county, it was so asserted in oral argument and not denied, and we accept it as true for our present purpose.

The appellant strongly insists that the fact that these petitions for temporary custody were denied by two different judges of the same court which tried this case, is practically controlling in the matter before us. We think these rulings have no bearing upon the question submitted. When respondent's first petition for temporary custody was denied, the divorce case which would decide the matter of custody was at issue and ready for trial. When the second petition was heard, the case had been tried, and an interlocutory decree settling the custody was presumably about to be · entered at any moment and, in fact, was entered in less than three weeks thereafter. No doubt, the judges who denied the respective petitions did so on the reasonable and sensible grounds that, under the circumstances above shown, the *status quo* should not be disturbed. There is, moreover, no showing that they even considered the merits of the matter.

Perhaps, the evidence most favorable to appellant's position found in the record is that to the effect that Mrs. Sewell neglected her baby, especially during the first few months after his birth when her motherly care was most needed. Appellant, Sewell, testified "when he was a little guy," his mother would not get up in the morning, and, accordingly, he frequently had to change the baby and see that he had his breakfast, and his grandmother, with whom they were then living, would have to bathe the baby and change his clothes. There was, however, no dispute or denial of the following testimony of the respondent:

"Q. Referring to the birth of the baby, was that a difficult birth? A. Yes, it was. I was in labor thirty-nine hours without any rest at all, and then it upset my nervous system. He was a breach [breech] baby. THE COURT: I could not hear the last. THE WITNESS: He was a breach [breech]

baby. Q. (by Mr. Smith) That is a particularly difficult birth? A. Yes. Q. How did that affect your health? A. Well, I was nervous afterward, and I wasn't supposed to be up and around for a month afterward, but I was."

There was another short period during which Mrs. Sewell was unable to care for her baby. She was compelled to undergo an operation for appendicitis when he was about fifteen months old.

The trial judge, of course, saw the appellant and heard him testify; likewise, his mother, at whose home the child had been kept more than eighteen months prior to the divorce action; also, appellant's eighteen-year-old sister, who had assisted in the boy's care. The trial judge also saw and heard the testimony of four neighbors as to the physical conditions in the Sewell home, the attitude of the child's grandmother and aunt, their treatment of the child, and the mutual love and affection between the child and his father.

The trial judge also heard the testimony of the respondent and of her father, of her brother, and of her stepmother, who had become so when respondent was eleven years old; all of which was given in person in open court. The trial judge further had before him, by deposition, the testimony of respondent's employer, of a fellow employee, and of several persons intimately acquainted with her father and stepmother, and the conditions in the home in which they lived. The trial judge said, in his memorandum opinion:

"I am satisfied that this child has had excellent care in the home where it is now. There has been no substantial showing at all to the contrary. I think the father is devoted to it and the grandmother is devoted to it. But I must also hold, weighing this evidence fairly, that the evidence shows that the conditions in the home of Mr. and Mrs. Allwardt in Spokane, the father and stepmother of the defendant, would also make a wholesome place for the child to be; and I am satisfied from the evidence that it would receive good care there."

We find nothing in the factual record that impels us to disagree with the above statement. The trial judge concluded that the respondent was a fit and proper person

to have custody of the child and awarded her that custody by applying the rule that, other things being equal, a child of tender years is entitled to the care of its mother. The appellant suggests the fact that the boy is no longer a baby in arms, but had reached the age of five years and three months when the decree appealed from was entered. There is merit in that suggestion, but we think the child has not reached an age at which the rule can be regarded as inapplicable.

It was also contended, and with good reason, that, since the child had lived for many months in his grandmother's home, it would be harmful to him to uproot him from his accustomed surroundings and require him to become adjusted to a new and unfamiliar life. At the time of the trial, that argument had merit. Subsequent events have robbed it of much of its force. In fact, it has now, to some degree at least, become an argument in favor of the respondent. After the trial, the appellant gave notice of appeal and flatly refused to obey the trial court's order directing him to surrender the boy to his mother. She applied to this court for relief. In denying her plea, the court held that, although the trial court had lost jurisdiction of the subject matter of the appeal, it still had jurisdiction to enforce its own order through a writ of assistance or by contempt proceedings. *Sewell v. Sewell*, 28 Wn. (2d) 394, 184 P. (2d) 76. The instant case was argued here on September 17th last. During the argument, it was stated by counsel for both parties that the trial court's order had been enforced through a writ of assistance, and that the child was then in the custody of the respondent. Exactly when this was accomplished we do not know, but we do know that the boy has been in the custody of his mother since September 17th at least. He has now, in all probability, become somewhat adjusted to his present environment.

The familiar formula: The trial court saw and heard the witnesses, and so forth, applies to this appeal. In our opinion, it alone requires us to affirm the order appealed from; but even if it did not, we would be required to hold that the trial court abused its discretion in order to reverse

the order from which this appeal is taken. As to that rule, the law is clear. We quote from the very recent opinion in *Aubry v. Aubry,* 26 Wn. (2d) 69, 173 P. (2d) 121 (decided in 1946):

"Of first importance in a divorce action is the welfare of the children of the parties to that action. In determining the question to whom shall be entrusted the care, custody, and control of such minor, the court has a wide discretion. We cannot say, from our examination of the record before us, that the court abused that discretion, therefore, the interlocutory decree is affirmed."

In our opinion, that is our situation in the instant case. The interlocutory decree from which this appeal is taken is, therefore, affirmed.

MALLERY, C. J., BEALS, STEINERT, and JEFFERS, JJ., concur.